IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division


**Eric Cristopher Washington,**
                    *Plaintiff*,


**v.**                                                    Civil Action No.   3:21-cv-13


**Thomas James Ross II,**
**Trustee under Land Trust Agreement**
**dated October 5, 2009 with Equity Trust Company,**
                    *Defendant*,
*Serve:*
31 Garrett Street,
Warrenton, Virginia, 20186

**John Ralston,**
*Defendant*,
*Serve:*
943 Glenwood Station Lane
Suite 101
Charlottesville, VA 22901

**Richard Owen,**
                    *Defendant*,
*Serve:*
41 Cottonwood Drive,
Barboursville, VA 22923

**and**

**E. Randall Ralston,**
*Defendant.*
*Serve:*
943 Glenwood Station Lane
Suite 101
Charlottesville, VA 22901

**COMPLAINT**

**PRELIMINARY STATEMENT**

1.   This case concerns an attempt by the Defendants to take advantage of Plaintiff Eric Washington's vulnerable position after his mother passed away and his family home was at risk of foreclosure.

2.   The property at the center of this of this case has been in Mr. Washington's family home since 1964. After Mr. Washington's mother passed away, and thus the family lost not only her but also her income, Mr. Washington and his siblings were unable to afford the payments on the mortgage that was on the home at the time. The family home was at imminent risk of foreclosure. While Mr. Washington initially sought to refinance this loan with a traditional mortgage loan, the Defendants fraudulently induced him to enter into a highly unusual mortgage loan (the "Subject Morgage Loan") that was structured to mask the extremely high costs of the loan.

3.   Defendants John Ralston and Richard Owen enticed Mr. Washington to transfer his home to a sham LLC as a part of the Subject Mortgage Loan in order to evade consumer protection laws. The Subject Mortgage loan was a $150,000 nine-month balloon note with a 10 percent interest rate and $39,858 in settlement fees, most of which went to the Defendants. The Subject Loan was arranged in order to transfer the equity in the home from Mr. Washington to Defendants. Mr. Washington is now again in imminent danger of losing his family home.

4.   The Defendants' actions surrounding the Subject Loan violate: the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq*; the Home Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639; Virginia's Common Law of Fraud; Virginia's Common Law of Conversion; Virginia's Consumer Protection Act ("VCPA"), Va. Code § 59.1-198, *et seq*; and attorney-client and mortgage broker fiduciary duty obligations.

**JURISDICTION AND VENUE**

5.   Jurisdiction is conferred on this Court by 15 U.S.C. § 1640(e) and 28 U.S.C. §§ 1331, 1337.  The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201.

6.   This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.   Venue lies in the Western District of Virginia pursuant to 28 U.S.C. § 1391(b) because the property that is the subject of the action is situated in Fluvanna County, Virginia.


## PARTIES

8.   The Plaintiff, Eric Washington, ("Mr. Washington"), is a natural person who principally resided at 43 Country Lane, Troy, Virginia 22974 (hereinafter called the "Subject Property") at the time he entered into the Subject Mortgage Loan.

9.   Defendant, "Thomas James Ross II, , Trustee under a Land Trust Agreement dated October 5, 2009 with Equity Trus Company" ("Lender") has an address of 31 Garrett Street, Warrenton, Virginia 20186.

10.  Defendant Attorney, John Ralston, is an attorney and mortgage broker who has an address of 943 Glenwood Station Lane Suite 101, Charlottesville, VA 22903.

11.  Defendant Mortgage Broker, Richard Owen, was a federally licensed mortgage loan originator engaged in the business of brokering consumer mortgage loans who had an address of 943 Glenwood Station Lane, Suite 104, Charlottesville, VA 22903 at the time of the transaction and now has an address of 41 Cottonwood Drive, Barboursville, VA, 22923.

12.  Defendant Settlement Agent, E. Randall Ralston, is an attorney and settlement agent who has an address of  943 Glenwood Station Lane Suite 101, Charlottesville, VA 22903.

13.  During the transaction in question, Defendant Lender extended a "high-cost mortgage" through Defendant Mortgage Broker to Plaintiff, making him a "creditor" under 15 U.S.C. § 1602(g) for the purposes of this transaction.

**FACTUAL ALLEGATIONS**

14.  Plaintiff Eric Washington was born and raised on the Subject Property and has considered it his home for his entire life.

15.  The Subject Property has been the Washington family home since 1964, when Mr. Washington's relatives, Mildred and Brasco Washington, conveyed the Subject Property to Mr. Washington's mother, Leona Garland.

16.  Ms. Garland resided on the property from 1964 until her death in 2019, during which time she built a house on the land where she raised her four children and two sisters after her parents died while their children were still young. The original house burned down in 2004, but Ms. Garland built the current house on the property.

17.  From 2014 to 2019, while Ms. Garland suffered from dementia and other health problems, Mr. Washington spent almost all of his nights at the Subject Property taking care of his mother and also would spend the weekends there with his wife and children.

18.  Through this time, while Mr. Washington spent his nights and weekends at the Subject Property, he sometimes stayed at the residence of his mother-in-law, Donna Ganoe, located at 1416 Decatur Drive, Charlottesville, VA, 22911. Ms. Ganoe allowed her daughter, Mr. Washington, and his children to temporarily stay at her home in Charlottesville while she was away working in Washington, D.C.. Ms. Ganoe is now selling the home, and it is currently under contract to be sold in 2021. Mr. Washington often uses 1416 Decatur Drive as his address on legal documents so that his children can attend Albermarle County Public Schools.

19.  On January 26, 2017, Ms. Garland refinanced a mortgage loan on Subject Property with a new $90,000 mortgage from lender Mr. Cooper ("Inherited Mortgage").

20.  On September 11, 2019, Leona Garland passed away, and the Subject Property passed to Leona's four children: Eric Washington, Amy Washington, Benjamin Washington, and Terri Washington.

21.  After Ms. Garland passed away, the Washington family continued to use the Subject Property as their family home. At this time, Mr. Washington spent four to five days a week at the Subject Property,

4

sleeping there at least four nights a week. Mr. Washington also assumed responsibility for the utility bills on the property and managed its upkeep by regularly mowing the lawn. Also at this time, Plaintiff's sister Amy Washington and her teenage son resided at the Subject Property full-time, and they continue to do so today.

22.  Once Ms. Garland passed away, Mr. Washington and his siblings struggled to make monthly payments on the Inherited Mortgage, and Mr. Cooper notified Mr. Washington of its intention to foreclose on the Subject Property.

23.  Around October 2019, Mr. Washington visited several mortgage lenders to discuss refinancing the Inherited Mortgage, but he was repeatedly denied refinancing due to his low credit score.

24.  Mr. Washington met Richard Owen who encouraged Mr. Washington to meet with John Ralston, a Charlottesville attorney with whom Mr. Owen said he had previously worked to arrange alternative home loans.

25.  Around one week later, Mr. Washington met Mr. Ralston at Mr. Owen's office, which is three suites down in the same office building as the Ralston Law Group. At this meeting, the parties discussed the possibility of refinancing the Inherited Mortgage. Mr. Washington was not asked to provide, and so did not provide, any proof of income to Mr. Ralston.

26.  During the course of their initial meeting, Mr. Washington explained that he had been rejected from many other mortgage lenders and was feeling "desperate" to find a loan to save his family home. Soon thereafter, John Ralston said that, if Mr. Washington was willing to agree to his terms, he could arrange a "term loan" to refinance the Subject Property and provide Mr. Washington with a cash advance.

27.  Mr. Ralston explained that most of the loan proceeds would be used to pay off the Inherited Mortgage.

28.  Mr. Ralston also explained that a relatively small portion of the loan proceeds would be distributed as a cash advance. Mr. Washington represented that if he got such a cash advance, it would be used to (1) pay off his existing debts in order to improve his credit score enough to refinance the loan, (2)

pay back his siblings who had contributed to cover expenses from their mother's funeral, (3) purchase supplies for his contracting business, and (4) open a convenience store.

29. As a result of this initial meeting with John Ralston, during which Mr. Ralston provided Mr. Washington legal advice on how to structure a potential mortgage refinancing loan, Mr. Washington believed that he had formed an attorney-client relationship with John Ralston.

30. In December, 2019, Mr. Washington learned that Defendant John Ralston was going to set up an LLC in order to make the loan. Mr. Washington expressed confusion as to why the LLC was required, but John Ralston assured him that it was a necessary part of the transaction.

31. The name of the LLC is 43 Country Lane, LLC, ("the Sham LLC") the address of the Washington family home that Mr. Washington sought to save.

32. The Sham LLC has never had any business operations, and Mr. Washington is its sole officer and sole member. The only activity that this LLC has ever undertaken is obtain the Subject Mortgage to save the Washington family home from foreclosure. Any property interests held by the Sham LLC are truly held by Mr. Washington.

33. A reverse search on the Virginia State Corporation Commission database reveals that Thomas James Ross II is listed as the registered agent for fourteen LLCs with the name "[Street Address], LLC," and John Ralston is a registered agent for five LLCs with the name "[Street Address], LLC." This research indicates that John Ralston and Mr. Ross may incorporate sham LLCs in the ordinary course of their mortgage brokering and lending business.

34. In the course of conversation, both Mr. Owen and Mr. Ralston told Mr. Washington that they had worked on similar transactions for other borrowers in the past, further suggesting that Mr. Ralston and Mr. Owen may incorporate sham LLCs in the ordinary course of their brokering business.

35. In reliance on what he was told by Defendants, Mr. Washington informed his siblings that the only way to save the Subject Property was for them to transfer their interests to him, so that he could move forward with the proposed loan transaction with Defendants.  In reliance on Defendants' statements, as relayed by Mr. Washington, the siblings agreed.

36.  Throughout December 2019, John Ralston prepared a series of legal documents for Mr. Washington to sign. Although Mr. Washington was confused as to the purpose of some of the documents, he signed the documents when Mr. Ralston advised that Mr. Washington's signature was necessary to get the loan. These documents had the following effects:

a.  12/13/2019: Mr. Washington's siblings conveyed their interests in the Subject Property to Mr. Washington by deed of gift. A copy of this deed of gift is attached as Exhibit A.

b.  12/13/2019: John Ralston prepared a deed granting Mr. Washington an easement to use a private road on his cousin's adjoining property. A copy of the easement is attached as Exhibit B.

c.  12/20/2019: John Ralston drafted and submitted documents to incorporate 43 Country Lane, LLC with John Ralston as the Registered Agent. A copy of the receipt for the Sham LLC filing fee, which is addressed to John Ralston, is attached as Exhibit C.

37.  On December 17, 2019, John Ralston sent an email containing "draft documents" for Mr. Washington and "clarifying [his] representation of the Lender."

38.  In December 2019, John Ralston informed Mr. Washington that he would withhold $15,000 of the loan proceeds and place the money in an escrow account purportedly to protect the lender from unsatisfied liens clouding title on the property, including:

a.  Three child support liens against Mr. Washington totaling $41,329.27;

b.  Two criminal liens against Benjamin Washington for $5,983.00.

39.  On December, 27, 2019, Mr. Washington met with John Ralston and Defendant Owen to sign the Subject Mortgage Loan. The Subject Mortgage Loan was a 9-month balloon note that would come due in September, 2020.

40.  Mr. Washington expressed concern to Mr. Owen and John Ralston about the short duration of the loan, but they assured him that if he didn't pay off the loan in 9-months "it ain't like you'll be kicked out or anything like that. We'll redo the loan." Mr. Ralston also assured Mr. Washington that he could obtain

a traditional mortgage refinancing loan at the end of the nine-month term. With these assurances, Mr. Washington agreed to move forward with the loan.

41. At the closing, Mr. Washington signed three more documents prepared by Mr. Ralston that had the following legal effects:

    a. 12/27/2019: Mr. Washington conveyed Subject Property to the Sham LLC by deed of transfer. A copy of this deed of transfer is attached as Exhibit D.

    b. 12/27/2019: The Sham LLC granted a deed of trust to Defendant Thomas James Ross II, Trustee under Land Trust Agreement dated October 5, 2009 with Equity Trust Company, with Mr. Owen as Trustee. A copy of this deed of trust is attached as Exhibit E.

    c. 12/27/2019: Defendant Thomas James Ross II, Trustee under Land Trust Agreement dated October 5, 2009 with Equity Trust Company, extends loan to the Sham LLC, secured by the deed of trust on Subject Property ("Subject Mortgage Loan"). A copy of the Subject Mortgage Loan is attached as Exhibit F.

42. The Subject Mortgage Loan had the following features (*see* Exhibit F):

    a. The Sham LLC agreed to pay the Lender $150,000 in principal plus 10% interest by September 27, 2020 ("Maturity Date").

    b. The Lender withheld from the loan proceeds 9 months of advanced interest.

    c. The note was secured by the Subject Property.

    d. Mr. Washington agreed to personally guarantee the note.

    e. The Sham LLC agreed to the following conditions upon default ("Default Conditions"):

        i. The interest rate increased from 10% to 15% per annum.

        ii. The lender could collect a late charge of 10% of the amount overdue if the payment due on the Maturity Date was late.

43. The nine-month term of the loan combined with the advanced interest made it very unlikely that Mr. Washington would be able to repay the loan because the entire amount, $150,000, came due at once in September 2020.

8

44. Mr. Washington never received any of the disclosures required by the Truth in Lending Act.

45. Mr. Washington never received the extra disclosures required under HOEPA for high-cost mortgages as set forth in 15 U.S.C. §§ 1639(a), 1639(b);

46. Mr. Washington never received the certificate of loan counseling from a counselor approved by the Secretary of Housing and Urban Development required for high-cost mortgages by 15 U.S.C. § 1639(u).

47. Mr. Washington never received the two copies of the notice of the right to rescind required by 15 U.S.C. § 1635(a) as interpreted by 12 C.F.R. § 1026.23(b)(1).

48. According to the settlement statement, which is attached as Exhibit G, the proceeds of the loan were distributed as follows:

    a.  $87,489.89 paid to Mr. Cooper to satisfy the late mother's mortgage

    b.  $22,652.11 paid to the Sham LLC

    c.  $39,858 of fees, including the following fees paid to the Defendants:

| Charge | Paid To | Amount |
|---|---|---|
| Origination Fee (6% of Loan) | Lender | $9,000 |
| Advanced Interest Payment | Lender | $11,250 |
| Settlement or Closing Fees | E. Randall Ralston | $2,500 |
| Extra Hazard Premium | E. Randall Ralston | $294 |
| Set up LLC and Cost Advance | E. Randall Ralston | $250 |
| Escrow for payoff | E. Randall Ralston | $15,000 |

49. At the closing, Defendant Owen told Mr. Washington that the origination fee of approximately $8,500 would be distributed to Defendant Owen as his compensation for brokering the loan.

50. As a result of the Subject Mortgage Loan, Mr. Washington owed $150,000 on the Subject Property, rather than the $87,489.89 owed on the Inherited Mortgage, resulting in the Washington family losing significant equity in the Subject Property.

51.  While the settlement statement, attached as Exhibit G, states that the cash advance was paid to the Sham LLC, the cash advance was deposited directly to Mr. Washington's personal bank account with SunTrust Bank.

52.  After the loan proceeds were distributed, Mr. Washington used his cash advance to make the following payments:

   a.   An estimated $9,000 in credit card debt,

   b.   An estimated $4,000 towards debt from his construction business,

   c.   An estimated $9,000 to his siblings and aunts to reimburse them for their share of expenses from Leona Garland's funeral.

53.  Throughout 2020, Mr. Washington explored opportunities to refinance the Subject Mortgage Loan. However, Mr. Washington was rejected by several mortgage lenders who expressed concern about both his improved, though still low, credit score and the unusual LLC structure of the Subject Mortgage Loan. It ultimately became clear to Mr. Washington that he could not pay back or refinance the Subject Mortgage Loan by the maturity date, September 27, 2020.

54.  In September 2020, Mr. Washington informed John Ralston he would be unable to repay the Subject Mortgage Loan. John Ralston orally agreed to extend the loan for four months but triggered the first Default Condition, increasing the interest rate on the loan from 10%  to 15% per annum and also charging a $1,500 late fee for each month the loan was in default.

55.  On January 11, 2021, John Ralston sent an email to Mr. Washington notifying him that the loan was in default and that the Lender was preparing to send a Notice of Trustee Sale. Mr. Washington's wife responded to this email and asked if the funds in the escrow account could be applied against the balance of the Subject Loan. Mr. Ralston refused to use the escrow funds to pay off the balance of the loan.

56.  The next morning, Mr. Washington's wife again asked John Ralston to apply money held in the escrow account to the Subject Mortgage Loan. However, John Ralston again denied her request.

57. On January 15, 2021, Thomas James Ross II sent a letter to Mr. Washington indicating that Mr. Washington had incurred $16,380 in late fees on the loan. At time of the letter, Mr. Washington's current balance included:

    a. $7,800 in interest charges from October 27, 2020 through January 27, 2021 reflecting the higher interest rate (15%);

    b. $780 in late fees for non-payment of monthly interest charges;

    c. $1,800 in attorney's fees to date; and

    d. $156,000 acceleration of principal, which is $6,000 more than the original amount of the note, possibly due to monthly $1,500 late charges for nonpayment of principal from October 27, 2020 through January 27, 2021.

58. Also, in the January 15, 2021 Letter, Thomas James Ross II threatened foreclosure and an additional $15,600 late charge unless the balance was paid in full by January 27, 2021. A copy of the January 15, 2021 letter from Mr. Ross is attached as Exhibit H.

59. On January 29, 2021, two of Mr. Washington's child support liens were satisfied, leaving only $10,985.06 in child support and criminal liens remaining against the Subject Property. See the child support lien satisfactions attached as Exhibit I.

60. On March 23, 2021, John Ralston emailed Mr. Washington requesting his consent to transfer the $15,000 held in escrow to the Lender, threatening: "Should you refuse to consent to transfer, then my firm will be forced to pay the escrow into Court."

61. On March 26, 2021, the Legal Aid Justice Center emailed John Ralston a letter expressing concerns about compliance with relevant law and requesting John Ralston produce documents, including documents related to the Subject Mortgage Loan and the escrow account.  Legal Aid Justice Center also noted that until additional information about the escrow account was provided, Mr. Washington would not consent to transfer the escrowed funds. A copy of the Legal Aid Justice Center's March 26, 2021 Letter is attached as Exhibit J.

11

62. On March 30, 2021, John Ralston responded to this request: "I have not had the chance to review your letter in full; however, I plan to do so as soon as reasonably possible."

63. On April 15, 2021, Mr. Washington, who had not previously received a Notice of Trustee Sale, saw in the local newspaper a Notice of Trustee Sale for the Subject Property. The foreclosure sale is scheduled for April 22, 2021.

64. On April 18, 2021, John Ralston followed up on his last email: "I have not forgotten your request. I plan to send documents within the coming week." John Ralston did not mention the upcoming foreclosure sale.

65. As of the date of this filing, no documents have been received by Mr. Washington or his counsel.

## FIRST CLAIM FOR RELIEF
(TILA)
(Against Defendant Thomas James Ross II, Trustee under Land Trust Agreement dated October 5, 2009 with Equity Trust Company)

66. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

67. The Truth in Lending Act ("TILA") imposes certain disclosure requirements upon creditors in consumer transactions. *See* 15 U.S.C. § 1638.

68. Pursuant to TILA, a consumer credit transaction is one in which (1) the party to whom credit is offered or extended is a natural person; and (2) the money or property which are the subject of the transaction are primarily for personal, family, or household purposes. 15 U.S.C. § 1602(i).

69. If TILA applies, then the creditor must provide a series of disclosures meant to inform the borrower of the cost of credit for the transaction, including the following terms, among others: the identity of the creditor, amount financed, finance charge, finance charge expressed as an annual percentage rate, total of payments, payment schedule, amount of late fees, and other statements of the borrower's rights. 15 U.S.C. § 1638(a). Such disclosures must be made before the credit is extended. 15 U.S.C. § 1638(b).

12

70. Under TILA, the creditor must also provide the borrower, prior to closing, two copies of a notice of the borrower's right to rescind the loan contract, which are "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 1026.17(a)(1); *accord* 15 U.S.C. § 1635(a); 12 C.F.R. § 1026.15(b).

71. If, as part of the consumer credit transaction, a security interest is or will be retained or acquired in the principal dwelling of the person to whom credit is extended, the consumer shall have the right to rescind the loan for a certain period of time after the creditor makes the required disclosures. 15 U.S.C. § 1635(a). In the event the creditor fails to comply with TILA's disclosure and notice requirements, a borrower is entitled to rescind a transaction up to three years after the date of consummation of the transaction. 15 U.S.C. § 1635(f).

72. As a refinance of the Inherited Mortgage, the Subject Mortgage Loan is subject to the three-year right to rescind and is not exempted by 15 U.S.C. § 1635(f) because the Subject Mortgage Loan was not made to "finance the initial acquisition or construction" of the home on the Subject Property.

73. To rescind a mortgage loan under TILA, the loan must be (A) made to a natural person; (B) for personal, family, or household purposes; and (C) be secured by the borrower's principal dwelling. 15 U.S.C. §§ 1602(i), 1635(a).

a. **Natural Person**

74. The true borrower in this transaction is Mr. Washington, a natural person.  The Court should apply a substance-over-form analysis to disregard the Defendants' attempt to use the 43 Country Lane, LLC as a subterfuge to evade TILA.

75. The 4th Circuit has recognized that "Courts have looked to the substance of transactions to determine whether they fall under the ambit of consumer protection statutes." *Smith v. EVB*, 438 F. App'x 176, 179 (4th Cir. 2011) (internal quotations omitted) (citing *Perk v. Worden*, 475 F.Supp.2d 565, 569 (E.D.Va.2007)).

76. Regulation Z, the Consumer Financial Protection Bureau's official interpretation of TILA, recognizes that substance, and not form, shall be used when classifying loans under TILA. *See* 12 C.F.R.

§ 1026.34(b) ("A creditor shall not structure any transaction that is otherwise a high-cost mortgage in a form, for the purpose, and with the intent to evade the requirements of a high-cost mortgage subject to this subpart[.]").

77. At all relevant times, 43 Country Lane, LLC, was a mere sham business entity that one or more Defendants designed to evade consumer protection statutes. It has no business operations and does not engage in any commercial activity. The only activity 43 Country Lane, LLC has ever done is obtain a mortgage loan, which saved the residential home with the address 43 Country Lane from foreclosure.

78. The true borrower, purported guarantor for, and sole member of 43 Country Lane, LLC is Mr. Washington, a natural person.

79. Defendant Lender's bad faith attempt, with the assistance of Defendant Ralston, to subvert the protections of TILA should be rejected, and Mr. Washington, a natural person, should be deemed the true borrower.

**80. <u>Consumer Purpose</u>**

81. The Subject Mortgage Loan was primarily for consumer purposes.

82. TILA only applies to money or property borrowed "primarily for personal, family or household purposes." 15 U.S.C. § 1602(i). It does not cover "extensions of credit primarily for business, commercial, or agricultural purposes." 15 U.S.C. § 1603(1).

83. That threshold is easily met in the present case. The primary purpose of Mr. Washington's loan was to pay off the Inherited Mortgage. *See* Exhibit G.

84. A Transaction involving one's home is a prototypical consumer purpose. *Curtis v. Propel Prop. Tax Funding*, LLC, 915 F.3d 234, 245 (4th Cir. 2019) ("Here, the subject of Curtis's transaction was his residential home, and he sought credit to finance the property taxes he owed on that home. It is hard to imagine a transaction more likely to constitute one 'primarily for personal, family, or household purposes.'").

85. Defendant Lender did not provide Mr. Washington with any disclosures before the consumer credit transaction took place. 15 U.S.C. § 1638(b)(1).

86. Mr. Washington did not otherwise waive or modify the timing requirements for the disclosures. 15 U.S.C. § 1638(b)(2)(F).

87. Defendant Lender also failed to provide two notices to Mr. Washington regarding his right to rescind the loan contract, in the time and manner required by TILA. *See* 15 U.S.C. § 1635(a); 12 C.F.R. §§ 1026.15(b) and 1026.17(a)(1).

   **b.  Principal Dwelling**

88. The home at 43 Country Lane is the borrower's principal dwelling for TILA purposes.

89. The remedy of rescission is available under TILA if a consumer credit transaction creates a security interest in the borrower's principal dwelling. 15 U.S.C. § 1635(a).

90. At the time the Subject Mortgage Loan was made, Mr. Washington  spent about five days and four nights a week at 43 Country Lane and kept his clothes and other belongings there in the months after his mother's death while he negotiated the Subject Mortgage Loan with Defendant John Ralston.

91. Moreover, the Subject Property has been in Mr. Washington's family for over 60 years. Mr. Washington's mother built a home on the property in 1964. She raised four children, including Mr. Washington, and her two younger sisters in that home. The original home burned down, but the family built the current home at 43 Country Lane in 2004. Mr. Washington has lived at the Subject Property for more than 50 years and has considered it his home his entire life. Mr. Washington's sister, Amy, and nephew currently live at the Subject Property full time.  It is a family home. *See James v. New Century Mortgage Corp.*, 2006 WL 2989242 (E.D. La. Oct. 17, 2006) ("[Plaintiff] regards this as a 'family house.'").

92. For most of 2019, Mr. Washington spent his nights and weekends at 43 Country Lane with his mother, as she was very ill. After his mother passed away, Mr. Washington continued to spend five or more days a week at the Subject Property, and his wife and three young children regularly spent weekends at the Subject Property. It was at this point that Mr. Washington sought out a mortgage loan to save his family home.

93. Because the Subject Mortgage Loan was a consumer credit transaction that created a security interest in Mr. Washington's principal dwelling, the Subject Mortgage Loan is subject to rescission under TILA. 15 U.S.C. § 1635(a).

    **c.   Creditor**

94. In addition to the three qualifications imposed on the borrower, TILA's requirements only attach to a "creditor" in a consumer credit transaction. *See* 15 U.S.C. § 1638.

95. One of the definitions of "Creditor" set forth in TILA  refers to any person who originates two or more mortgages considered "high-cost mortgages," as defined by TILA, in any 12-month period or any person who originates one "high-cost mortgage" through a mortgage broker. 15 U.S.C. § 1602(g).

96. A mortgage loan is considered a "high-cost mortgage" if it is a first mortgage on the consumer's principal dwelling with points and fees that exceed 5% of the amount of the loan, excluding all finance charges as defined by TILA. 15 U.S.C. § 1602(bb)(1)(A)(ii)(I); 12 C.F.R. § 1026.32(a)(1)(ii). A mortgage loan may also be considered a "high-cost mortgage" if it is a first mortgage on the consumer's principal dwelling with an annual percentage rate ("APR") that exceeds, by more than 6.5 percentage points, the average prime offer rate ("APOR"). *See* 15 U.S.C. § 1602(bb)(1)(A)(i)(I); 12 C.F.R. § 1026.32(a)(1)(i).

97. Points and fees include "all items included in the finance charge, except interest or the time-price differential." 15 U.S.C. § 1602(bb)(4)(A); 12 C.F.R. § 1026.32(b)(1)(i)(A).

98. The finance charge includes "all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a).

99. Among finance charges are "loan fees," which include origination fees payable to the creditor. 15 U.S.C. § 1605(a)(3); 12 C.F.R. § 1026.4(b)(3).

100.     Per the settlement statement attached as Exhibit G, the Subject Mortgage Loan included a 6% origination fee payable to Defendant Lender, which alone exceeds the 5% points-and-fees trigger for "high-cost mortgage" protections. *See* 15 U.S.C. § 1602(bb)(1)(A)(ii)(I); 12 C.F.R. § 1026.32(a)(1)(ii). Therefore, the Subject Loan is a "high-cost mortgage."

101.     Defendant Lender is a creditor in a consumer credit transaction secured by Mr. Washington's principal dwelling, namely the Subject Mortgage Loan. Thus, TILA applies to the Subject Mortgage Loan. Defendants materially failed to meet their TILA disclosure obligations when they provided no written disclosures to Mr. Washington.

102.     Because Defendant Lender has failed to provide the required notices and disclosures, Mr. Washington may exercise his right to rescind the transaction up until and including at least December 27, 2022. 15 U.S.C. § 1635(f); 12 C.F.R. § 1026.23(a)(3)(i).

103.     "To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business." 12 C.F.R. § 1026.23(a)(2)

104.     As the 4th Circuit has recognized, filing a complaint or other claim that seeks TILA rescission satisfies the written communication requirement because when the borrower serves the complaint the creditor receives notice of the borrower's desire to rescind the mortgage. *See Jones v. Saxon Mortgage, Inc.*, 161 F.2d 2 (table), 1998 WL 614150 (4th Cir. Sept. 9, 1998) (filing of lawsuit can be sufficient but complaint must seek rescission); *Toney v. LaSalle Bank*, 896 F. Supp. 2d 455, 477 (D.S.C. 2012), *aff'd per curiam*, 512 Fed. Appx. 363 (4th Cir. 2013) (*pro se*) (adopting, on other grounds, magistrate's decision, which includes a finding that borrower's counterclaim in state court action was sufficient notice of rescission).

105.     As a result of the foregoing, Mr. Washington has a statutory right to rescind the Subject Mortgage Loan pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23. Mr. Washington therefore requests that this Court enter judgment in his favor and against Defendant Lender, by:

    a.  ordering the rescission of Mr. Washington's Subject Mortgage Loan;

    b.  ordering Defendant Lender to return to Mr. Washington any finance charges and fees paid in connection with Mr. Washington's Subject Mortgage Loan;

    c.   entering an order exercising the Court's equitable jurisdiction to alter the timing of tender to allow Mr. Washington a reasonable time to obtain financing or sell Subject Property to tender the amount due by him in TILA rescission, if any amount will be due by him in TILA rescission;

    d.   ordering Defendant Lender to terminate any security interest in 43 Country Lane created as a result of the mortgage Subject Mortgage Loan described herein;

    e.   declaring any security interest in 43 Country Lane created as a result of the Subject Mortgage Loan described herein as null and void; and

    f.   ordering that Defendant Lender pay to Mr. Washington the costs of this action, together with reasonable attorney's fees as determined by this Court.

## SECOND CLAIM FOR RELIEF
### (HOEPA)
(Against Defendant Thomas James Ross II, Trustee under Land Trust Agreement dated October 5, 2009 with Equity Trust Company)

106.    Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

107.    Subject Mortgage Loan was a high-cost mortgage governed by the federal Home Ownership and Equity Protection Act ("HOEPA").

108.    The HOEPA is an amendment to TILA, designed to address abusive practices in refinances and home equity loans with high interest rates or high fees.

109.    When a TILA creditor extends a "high-cost mortgage" within the meaning of HOEPA, it is subject to additional disclosure requirements and restrictions on loan terms. *See* 15 U.S.C. § 1639.

110.    The Subject Loan is a "high-cost mortgage" subject to HOEPA. Because Defendant Lender did not provide the disclosures or comply with the restrictions imposed by HOEPA, Mr. Washington has a statutory right to rescind the Subject Loan and is entitled to recover actual and statutory damages.

111.    A mortgage loan is considered a "high-cost mortgage" if it is a first mortgage on the consumer's principal dwelling with points and fees that exceed 5% of the amount of the loan, excluding all finance charges as defined by TILA. 15 U.S.C. § 1602(bb)(1)(A)(ii)(I); 12 C.F.R. § 1026.32(a)(1)(ii). A mortgage loan may also be considered a "high-cost mortgage" if it is a first mortgage on the consumer's principal dwelling with an annual percentage rate ("APR") that exceeds, by more than 6.5 percentage points, the average prime offer rate ("APOR"). *See* 15 U.S.C. § 1602(bb)(1)(A)(i)(I); 12 C.F.R. § 1026.32(a)(1)(i).

112.    Per the settlement statement attached as Exhibit G, the Subject Mortgage Loan included a 6% origination fee payable to Defendant Lender, which alone exceeds the 5% points-and-fees trigger for "high-cost mortgage" protections. *See* 15 U.S.C. § 1602(bb)(1)(A)(ii)(I); 12 C.F.R. § 1026.32(a)(1)(ii). Therefore, the Subject Loan is a "high-cost mortgage."

113.    If a loan is considered a "high-cost mortgage" within the meaning of HOEPA, it is subject to additional substantive protections, including but not limited to: high-cost mortgage disclosures, prohibition of prepaid payments, prohibition of balloon payments, prohibition on raising the interest rate upon default, consideration of ability to repay in underwriting process, and mandatory loan counseling. 15 U.S.C. § 1639.

114.    Regarding the borrower's ability to repay, HOEPA specifically prohibits a "pattern or practice of extending credit to consumers…based on the consumers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment." 15 U.S.C. § 1639(h).

115.    A creditor that fails to comply with the high-cost mortgage requirements of HOEPA may be liable for actual damages, statutory damages of up to $4,000, additional statutory damages amounting to the sum of all finance charges and fees paid by the consumer, and reasonable costs and attorney's fees. 15 U.S.C. § 1640(a). Violations of HOEPA are subject to a three-year statute of limitations beginning on the date of the occurrence of the violation. 15 U.S.C. § 1640(e).

116.     The terms of the Subject Loan violated HOEPA's additional protections in the following ways, including but not limited to:

a.  failing to provide specific disclosures in conspicuous type size not less than three business days prior to consummation of the transaction in violation of 15 U.S.C. §§ 1639(a), 1639(b);

b.  providing for an interest rate applicable after default (15%) that is higher than the interest rate that applies before default (10%) in violation of 15 U.S.C. § 1639(d);

c.  providing for a scheduled payment that is more than twice as large as the average of earlier scheduled payments, by requiring the entire loan balance to become due after one year of interest-only payments in violation of 15 U.S.C. § 1639(e);

d.  requiring Mr. Washington pay nine-months of interest in advance in violation of 15 U.S.C. § 1639(g);

e.  extending credit to Mr. Washington without regard to his repayment ability in violation of 15 U.S.C. § 1639(h);

f.  charging Mr. Washington a fee of $6,000 to extend the high-cost mortgage in violation of 15 U.S.C. § 1639(s);

g.  failing to obtain a certificate of loan counseling from a counselor approved by the Secretary of Housing and Urban Development pursuant to 15 U.S.C. § 1639(u).

117.     As a result of the above-described violations of HOEPA and TILA, Mr. Washington has a statutory right to rescind the Subject Loan with Defendant Lender pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23.

118.     As a result of the above-described violations of HOEPA, Defendant Lender is liable for actual damages sustained by Mr. Washington, statutory damages of up to $4,000, additional statutory damages for HOEPA violations amounting to the sum of all finance charges and fees paid by Mr. Washington, and reasonable costs and attorney's fees for this action. 15 U.S.C. §§ 1640(a)(1), (a)(2)(A)(iv), (a)(3) and (a)(4).

119.      Accordingly, Mr. Washington requests that this Court enter judgment in his favor and against Defendant Lender by:

    a.   ordering the rescission of Washington's loan transaction;

    b.   ordering Defendant Lender to return to Mr. Washington any finance charges and fees paid in connection with Subject Loan;

    c.   entering an order exercising the Court's equitable jurisdiction to alter the timing of tender to allow Mr. Washington a reasonable time to obtain financing or sell Subject Property to tender the amount due by him in TILA rescission, if any amount will be due by him in TILA rescission;

    d.   ordering Defendant Lender to terminate any security interest in the Subject Property created as a result of the mortgage loan transactions described herein;

    e.   declaring any security interest in the Subject Property created as a result of the mortgage loan transactions described herein as null and void;

    f.   ordering that Defendant Lender pay the following damages to Mr. Washington:

        i.   actual damages sustained as a result of Defendant Lender's violations of 15 U.S.C. §§ 1635 and 1639;

        ii.   statutory damages as described in 15 U.S.C. § 1640(a);

        iii.   the costs of this action, together with reasonable attorney's fees as determined by this Court; and

        iv.   additional enhanced damages in an amount equal to the sum of all finance charges and fees paid by Mr. Washington.

### THIRD CLAIM FOR RELIEF
(Common Law Fraud)
(Against Defendant John Ralston)

120.      Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

121.     The Virginia Supreme Court has identified six elements of a cause of action for actual fraud. One must allege "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Owens v. DRS Auto. Fantomworks, Inc.*, 228 Va. 489, 497, 764 S.E.2d 256, 260 (quoting *Richmond Metro. Auth. V. McDevitt Street Bovis, Inc.*, 256 Va. 553, 557, 507 S.E.2d 344, 346 (1998)).

122.     The plaintiff bears the burden of proving these elements by clear and convincing evidence. *Id*.

123.     Virginia also recognizes fraud by omission, sometimes called "concealment."

124.     Concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud. *Bank of Montreal v. Signet Bank,* 193 F.3d 818, 827 (4th Cir. 1999), *internal citations omitted*.

125.     Defendant John Ralson made two false representations or concealments of material facts. Specifically, he misrepresented or concealed (1) the true purpose of the Sham LLC and (2) the true nature of his relationship with the lender.

126.     First, John Ralston made a false representation of a material fact when he concealed the true purpose of the Sham LLC, which was to evade federal consumer lending protections.

127.     John Ralston intentionally and knowingly failed to inform Mr. Washington that by conveying the Subject Property to a Sham LLC, Mr. Washington could lose the valuable federal consumer lending protections that both TILA and HOEPA provide.   In so doing, John Ralston acted with conscious disregard of Mr. Washington's rights.

128.     By simply representing that the formation of an LLC was necessary to extend the loan, without explaining the true purpose of the Sham LLC, John Ralston intentionally misled Mr. Washington into forgoing these federal protections.

129.     Mr. Washington reasonably relied on the representations that John Ralston made, consenting to the formation of the Sham LLC and trusting Mr. Ralston that this was a necessary part of the loan transaction.

130.     If Mr. Washington were aware of the real reason for the formation of the Sham LLC and the transfer of his family home to it, then Mr. Washington would have made a different decision about entering into this mortgage loan. Mr. Washington could have explored other options, such as getting a loan modification with Mr. Cooper or asking family members for assistance in getting the Inherited Mortgage current.  Even if other financing options had not materialized, Mr. Washington would have sold his home and thus recaptured his home equity.  At the time, Mr. Washington's home equity was approximately $78,000. As result of John Ralston's intentional misrepresentations about the true reasons for creating the Sham LLC, Mr. Washington suffered damage, specifically the loss of his home equity.

131.     Second, John Ralston made a false representation of a material fact when he concealed the fact that he was acting as the lender's lawyer when he first met with Mr. Washington.

132.     When Richard Owen introduced Mr. Washington to John Ralston, Mr. Washington was under the impression that John Ralston would act as Mr. Washington's lawyer because Defendant Owen introduced John Ralston as a lawyer who would help arrange a loan to save Mr. Washington's family home.

133.     Because John Ralston concealed his role as the lender's lawyer, Mr. Washington was actively misled into believing that John Ralson would act in Mr. Washington's best interest, through John Ralston's fiduciary duty as his lawyer.

134.     This role as the lender's lawyer was not clarified until well after their conversations about the Sham LLC and Mortgage Loan, as well as after the conveyance of the siblings' property interest to Eric. Ralston's clarification that he represented the lender came once the deal was already in motion.

135.     The settlement statement, attached as Exhibit G, reveals that defendant John Ralston's law firm even charged Mr. Washington $250 for setting up the Sham LLC. This underscores the reasonableness of Mr. Washington's belief that John Ralston was his lawyer.

136.     Mr. Washington reasonably relied on Defendant John Ralston's concealment of the true purpose of the Sham LLC and his role as the lender's lawyer because Mr. Washington believed that Mr. Ralston was acting as his own lawyer and would act in his best interest.

23

137.     If Mr. Washington had been aware early on that Mr. Ralston was not in fact looking out for his best interests, but rather was representing the lender, Mr. Washington would have known to seek other counsel or else avoid the transaction entirely. Again, even if other financing options had not materialized, at very least Mr. Washington would have sold his home. As result of Mr. Ralston's intentional misrepresentations about the true reasons for the Sham LLC, Mr. Washington suffered damage in the form of the near-total loss of his home equity.

138.     Under Virginia Law, "a false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always grounds for recission of a contract" as well as damages. *Persaud Cos. V. IBCS Group, Inc.*, 425 Fed. Appx. 223, 226 (4th Cir. 2011) (quoting *George Robberecht Seafood, Inc. V. Maitland Bros. Co.*, 220 Va. 109, 255 S.E.2d 682, 683 (Va. 1979)) (internal citations omitted).

139.     Accordingly, Mr. Washington requests that this Court enter judgment in his favor and against Defendant John Ralston by:

   a.  rescinding the Sham LLC's Articles of Incorporation due to John Ralston's fraud by omission with respect to the true purpose of the Sham LLC, and his role as the lender's attorney;

   b.  rescinding the Deed of Transfer conveying the Subject Property from Mr. Washington to the Sham LLC due to the rescission of the Articles of Incorporation of the Sham LLC, thereby voiding the security interest created by the Deed of Trust in the Subject Property; and

   c.  rescinding the Subject Mortgage Loan due to John Ralston's fraud by omission with respect to his concealed role as the Lender's attorney, and the true costs of this mortgage.

   d.  Awarding Mr. Washington punitive damages in the amount of $45,000.

### FOURTH CLAIM FOR RELIEF
(Tort of Conversion)
(Defendants E. Randall Ralston, John Ralston)

140.     Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

24

141.     The tort of conversion "encompasses any wrongful exercise or assumption of authority...over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *PGI Inc. V. Rathe Productions Inc.*, 265 Va. 334, 344, 476 S.E.2d 438 (Va. 2003) (internal citations omitted).

142.     The state of Virginia recognizes that money can be the subject of conversion. *See Golden v. Chaplin*, 79 Va. Cir. 155 (Vir. Cir. Ct. 2009).

143.     At the loan closing, $15,000 of the loan proceeds payable to Mr. Washington were placed into an escrow account held by the Ralston Law Group.  *See* Exhibit G.

144.     Despite a request from counsel, Defendant John Ralston has not provided a copy of any agreement authorizing an escrow account or outlining the supposed purpose of such account.

145.     Absent an agreement otherwise, the proceeds of the loans belong to the true borrower on the loan, Mr. Washington.

146.     Though Defendant John Ralston arranged the escrow account and requested permission to transfer its funds to Defendant Lender, Defendant Randall Ralston is listed as the escrow agent. *See* Exhibit G.

147.     There are two instances of conversion in this transaction: (1) conversion of the loan proceeds and (2) conversion of the contents of the escrow account.

148.     First, Defendants John and Randall Ralston committed the tort of conversion when they placed the $15,000 into the escrow account.

149.     The Subject Mortgage Loan does not authorize withholding any proceeds in an escrow account, and the Note specifically provides that the agreement cannot be amended unless "made in writing and executed by Borrower and Lender."

150.     Despite requests from counsel, the Defendants have provided no evidence of a written agreement modifying the terms of the Subject Mortgage Loan to provide that loan proceeds will be withheld in an escrow account.

151.     In the absence of a written agreement, placing $15,000 that should have gone directly to Mr. Washington into an escrow account is inconsistent with Mr. Washington's ownership interest in the loan proceeds, as Defendants denied Mr. Washington access to funds that were lawfully his and his alone, and thus constitutes the tort of conversion.

152.     Second, assuming *arguendo* that the creation of the escrow account was authorized by Mr. Washington, Defendants John and Randall Ralston committed the tort of conversion when they refused to return the $15,000 held in escrow after Mr. Washington demanded access.

153.     When the Mortgage Loan went into default, Mr. Washington asked John Ralston for the escrow funds to be returned to him, so he could apply the money towards his loan.

154.     John Ralston refused to return the escrow funds, and declined to apply them towards the balance due, claiming that they agreed to use the escrow for child support liens.

155.     Defendants have provided no evidence that Mr. Washington made any agreements regarding the use of the money in the escrow account.

156.     Unless there was consideration given when Mr. Washington allegedly agreed to use the escrow account to pay child support liens, any alleged agreement for the use of the funds would not be binding.

157.     Further, the liens for which the escrow was allegedly earmarked are only for $10,985.06 while the amount in escrow is $15,000.  Defendants have offered no explanation for why they must now maintain an escrow that exceeds the size of the debt.

158.     Refusing to return Mr. Washington's $15,000 in escrow or apply it on his behalf is inconsistent with Mr. Washington's ownership interest in the funds, and thus constitutes the tort of conversion.

159.     Under Virginia law, the remedy for conversion is compensatory damages. *Gordon v. Pete's Auto Serv. of Denbigh*, 637 F.3d 454, 460 (4th Cir. 2011) (applying Virginia law).

160.      Accordingly, Mr. Washington requests that this Court enter judgment in his favor by ordering Defendants John and Randall Ralston restore the converted $15,000 to Mr. Washington in full.

## FIFTH CLAIM FOR RELIEF
(VCPA)
(Against Defendant John Ralston)

161.     Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

162.     At all times relevant hereto, the Defendant John Ralston, in his capacity as an attorney, is a supplier as that term is used in the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-198, because John Ralston sold his legal services to Mr. Washington in a consumer transaction. The settlement statement indicates John Ralston's law firm charged Mr. Washington a $250 fee to set up Sham LLC.

163.     The transaction described herein between Mr. Washington and Defendant John Ralston is a consumer transaction as that term is used in the VCPA, Va. Code § 59.1-198, because Defendant John Ralston sold his legal services to Mr. Washington to facilitate a consumer mortgage loan.

164.     The VCPA prohibits suppliers from "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code § 59.1-200(14).

165.     Defendant John Ralston violated this provision of the VCPA by concealing two material facts about his legal services: (1) the true purpose of the Sham LLC and (2) his role as the Lender's attorney.

166.     First, Defendant John Ralston acted deceptively by willfully concealing the material fact that the true purpose of incorporating the Sham LLC and conveying the Subject Property to the Sham LLC was to evade consumer protection laws.

167.     By concealing that the true purpose of the Sham LLC was to evade consumer protection laws, Defendant John Ralston willfully misled Mr. Washington into foregoing the valuable federal consumer lending protections that both TILA and HOEPA provide.

168.     Because Mr. Washington reasonably believed that Mr. Ralston was his lawyer and represented his best interests, Mr. Washington reasonably relied on Mr. Ralston's concealment of the true purpose of the Sham LLC when he agreed to let Mr. Ralston incorporate the Sham LLC, consolidate his

sibling property interest, and, once consolidated, convey the complete interest in Subject Property to the Sham LLC.

169.     If Mr. Washington had been made aware of the real reason he was being told to form an LLC and transfer his family home to it, Mr. Washington would have made a different decision about entering into Subject Mortgage Loan. Mr. Washington could have explored other options such as a obtaining a loan modification for his mother's existing mortgage or asking for assistance from family members to get his mother's mortgage current. Even if other financing options had not materialized, Mr. Washington would have sold his home and thus recaptured his home equity. At the time, Mr. Washington's home equity was approximately $78,000. As result of Mr. John Ralston's willful misrepresentations about the true reasons for the Sham LLC, Mr. Washington suffered a significant loss of his home equity.

170.     Second, Defendant John Ralston acted deceptively when he willfully concealed the material fact that he was the Lender's attorney when negotiating with Mr. Washington.

171.     Defendant John Ralston met with Mr. Washington at the Ralston Law Group office several times and provided Mr. Washington with legal advice on how to structure Subject Mortgage Loan, without disclosing his identity as the attorney for Defendant Lender.

172.     After their initial meeting, Defendant John Ralston prepared several legal documents— the Deed of Gift from Mr. Washington's siblings and the easement benefitting 43 Country Lane—for Mr. Washington all while concealing his role as the attorney for Defendant Lender.

173.     Defendant John Ralston did not clarify his role as Defendant Lender's attorney until December 17, 2019, which was well after the deal was already in motion.

174.     By concealing his identity as Defendant Lender's attorney, Defendant John Ralston willfully misled Mr. Washington into believing that John Ralston would advocate for Mr. Washington's best interests as his attorney.

175.     Mr. Washington reasonably relied on Defendant John Ralston's concealment of his role as Defendant Lender's attorney when he decided to enter into a consumer transaction by engaging Mr. Ralston's legal services.

176.     Had Mr. Washington known that Defendant John Ralston was Defendant Lender's attorney, Mr. Washington would have known to seek other counsel or avoid the transaction entirely. Because Defendant Ralston willfully concealed this material fact, Mr. Washington agreed to enter into a consumer transaction, which ultimately led Mr. Washington losing almost all of his equity in his home.

177.     Because Mr. Washington has suffered a loss as a result of Defendant Ralston's VCPA violations, Mr. Washington is entitled to recover actual damages, or $500, whichever is greater. *See* Va. Code § 59.1-204(A). If the trier of fact finds the violation was willful, it may increase damages to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater. *Id*.

178.     Accordingly, Mr. Washington requests that this Court enter judgment in his favor and order Defendant John Ralston pay Mr. Washington damages pursuant to Va. Code § 59.1-204(A) in an amount determined by this Court.

## SIXTH CLAIM OF RELIEF
(Breach of Fiduciary Duty)
(Against Defendant John Ralston)

179.     Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

180.     Defendant John Ralston owed Mr. Washington a fiduciary duty as his lawyer and mortgage broker. Defendant John Ralston's actions in arranging the Subject Mortgage Loan violated his fiduciary duty.

181.     Mr. Washington suffered damages as a result of this breach of fiduciary duty by losing significant equity in the Subject Property. He, therefore, has a statutory right to recover actual damages, attorney's fees, and court costs. *See* Va. Code § 6.2-1627.

a.   **Defendant John Ralston Owed a Fiduciary Duty to Mr. Washington**

182.     John Ralston owed a fiduciary duty to Mr. Washington because of his two roles as Mr. Washington's attorney and mortgage broker.

183.     Attorneys owes their clients a fiduciary duty to use reasonable efforts to act in their best interest and to avoid conflicts of interest.

184.     An implied attorney-client relationship is created through an implied contract of employment when "the advice and assistance of the attorney is sought and received, in matters pertinent to his profession." *See Nicholson v. Shockey,* 192 Va. 270, 277, 64 S.E.2d 813, 817 (Va. 1951).

185.     An attorney-client relationship existed between Defendant John Ralston and Plaintiff Eric Washington because Mr. Washington went to Defendant John Ralston seeking legal advice on obtaining a mortgage loan and Defendant John Ralston provided legal advice and assistance by (1) preparing and executing a deed of gift conveying Subject Property from Mr. Washington's siblings to Mr. Washington, (2) preparing and executing a deed granting Mr. Washington an easement to use a private road on his cousin's adjoining property, (3) incorporating and acting as a registered agent for 43 Country Lane LLC, (4) preparing and executing a deed of transfer conveying the Subject Property to Sham LLC, and (5) drafting and structuring the Subject Mortgage Loan.

186.     Defendant John Ralston's law firm even charged Mr. Washington $250 for setting up the Sham LLC, further indicating an attorney-client relationship existed between Defendant John Ralston and Mr. Washington.

187.     Because an attorney-client relationship existed between Defendant John Ralston and Mr. Washington, Defendant Ralston owed Mr. Washington a fiduciary duty as his lawyer.

188.     Mortgage brokers also owe their clients a fiduciary duty to "use reasonable skill, care, and diligence in exercising the broker's duty... to make reasonable efforts to secure a mortgage loan that is in the best interests of the applicant, considering the applicant's circumstances and loan characteristics." *See* Va. Code § 6.2-1616(B)(6).

189.      Virginia defines a "mortgage loan" as a "loan made to an individual, the proceeds of which are to be used primarily for personal, family, or household purposes, which loan is secured by a

30

mortgage or deed of trust upon any interest in one-to four-family residential property located in the Commonwealth." *See* Va. Code § 6.2-1600.

190.     The Subject Mortgage Loan was a "mortgage loan" as defined by Va. Code § 6.2-1600 because it was a loan made to Mr. Washington, the true borrower on the loan, for the primary purpose of refinancing his family home, and secured by a deed of trust upon an interest in a one-to four-family residential property.

191.     The defendant's bad faith attempt to evade consumer protections through characterizing the borrower on the Subject Mortgage Loan as an entity shall be ignored consistent with Virginia's emphasis on substance-over-form in interpreting consumer loans. *See Van Dyke v. Commonwealth*, 178 Va. 418, 424, 17 S.E.2d 366, 369 (Va. 1941) ("To frustrate [consumer protection] evasions the courts have been compelled to look beyond the form of a transaction to its substance, and they have laid it down as an inflexible rule that mere form is immaterial, but that it is the substance which must be considered.").

192.     A mortgage broker refers to a person who directly or indirectly negotiates, places, or finds mortgage loans for others. Va. Code § 6.2-1600.

193.     Attorneys are considered mortgage brokers when they actively and principally engage in negotiating, placing, or finding mortgage loans. Va. Code § 6.2-1602(8).

194.     Defendant John Ralston found and negotiated a mortgage loan for Mr. Washington.

195.     Defendants Owen and John Ralston represented to Mr. Washington that they have worked together to find and place mortgage loans for other consumers.

196.     Defendant John Ralston is a registered agent for five Virginia LLCs named "[Address], LLC," indicating that he is actively and principally engaged in finding and placing similar mortgage loans to the Subject Mortgage Loan.

197.     Because John Ralston is actively and principally engaged in placing, finding, and negotiating mortgage loans, Defendant John Ralston is a "mortgage broker" as defined by Va. Code § 6.2-1600.

198.     Because Defendant John Ralston acted as a mortgage broker in finding Mr. Washington a mortgage loan, Defendant John Ralston owed Mr. Washington a fiduciary duty.

**b.   <u>Defendant John Ralston Breached His Fiduciary Duty</u>**

199.     Defendant John Ralston violated his fiduciary duty by (1) failing to use reasonable efforts to secure a mortgage loan that was in the best interest of Mr. Washington, (2) acting in his own financial interest and not that of his client, and (3) representing a party directly adverse to Mr. Washington's interests in the Subject Mortgage Loan.

200.     First, Defendant John Ralston violated his fiduciary duty to Mr. Washington by failing to use reasonable efforts to secure a mortgage loan that was in the best interest of Mr. Washington.

201.     Mr. Washington specifically told Defendant John Ralston that he was feeling "desperate" to save his home after other mortgage lenders rejected his request for refinancing. Because Defendant John Ralston knew Mr. Washington was ineligible for traditional mortgage funding from several other mortgage lenders, Defendant John Ralston was on notice that other mortgage lenders believed Mr. Washington's would have trouble paying back or refinancing a mortgage loan.

202.     With knowledge that Mr. Washington was ineligible for traditional mortgage refinancing, Defendant John Ralston offered to arrange a loan for Mr. Washington without requiring Mr. Washington provide any sort of proof of income.

203.     By offering a high-risk nine-month balloon note, while on notice that Mr. Washington might struggle to pay back or get refinancing for the loan, and without attempting to verify Mr. Washington's ability to repay the loan, Defendant John Ralston failed to use reasonable efforts to secure a mortgage loan that was in the best interests of Mr. Washington. *See* Va. Code § 6.2-1616(B)(6).

204.     Second, John Ralston violated his fiduciary duty to Mr. Washington by putting his own personal financial interests ahead of Mr. Washington.

205.     Defendant John Ralston generated at least $3,044 in fees for the Ralston Law Group from the Subject Mortgage Loan. Fees paid directly to the Ralston Law Group include the settlement fee, extra hazard premium, and a charge for setting up the Sham LLC. *See* Exhibit G .

206.     By encouraging Mr. Washington to accept a loan that financially benefited Defendant John Ralston, without undertaking reasonable efforts to determine whether the loan was in the best interests of Mr. Washington, Defendant John Ralston put his own financial interest ahead of Mr. Washington's interests.

207.     Defendant John Ralston violated his fiduciary duty to act in the best interest of his client by putting his own financial interests ahead of the interests of his client.

208.     Third, Defendant John Ralston breached his fiduciary duty to Mr. Washington by representing a party directly adverse to Mr. Washington.

209.     Before December 17, 2019, Defendant John Ralston created an attorney-client relationship between himself and Mr. Washington by providing Mr. Washington with legal advice and assistance through drafting documents for the Subject Mortgage Loan as well as preparing and executing the Deed of Gift conveying the Subject Property to Mr. Washington.

210.     In an email dated December 17, 2019, Defendant John Ralston stated that he represented the Defendant Lender in the Subject Mortgage Loan.

211.     By representing both Mr. Washington and the Lender for the same transaction in which their interests conflict, Defendant John Ralston breached his fiduciary duty to avoid representing clients on *transactions* involving a concurrent conflict of interest. *See* Prof'l Guidelines and Rules of Conduct r. 1.7 (Va. Bar Ass'n 2009).

   c.   **Mr. Washington Incurred Damages as a Result of Defendant John Ralston's Breach of Fiduciary Duty**

212.     As a result of Defendant John Ralston's breach of his fiduciary duty as a mortgage broker and attorney, Mr. Washington entered into the Subject Mortgage Loan and incurred $39,858 in settlement fees and costs as well as $16,380 in late fees on the Subject Mortgage Loan, all of which eroded Mr. Washington's equity in the Subject Property.

213.     In addition, as a result of Defendant John Ralston's breach, Mr. Washington's home is now scheduled for foreclosure, and, if sold in a foreclosure sale, Mr. Washington may lose any equity that remains in Subject Property.

214.     Accordingly, Mr. Washington requests that this Court enter judgment in his favor and order Defendant John Ralston pay Mr. Washington actual damages, attorney's fees, and court costs as authorized for a breach of fiduciary duty in an amount determined by this Court. *See* Va. Code § 6.2-1627.

**SEVENTH CLAIM FOR RELIEF**

(Breach of Mortgage Broker Fiduciary Duty)
(Against Defendant Richard Owen)

215.     Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

216.     Defendant Owen owed Mr. Washington a fiduciary duty as his mortgage broker, and Defendant Owen breached that duty by finding a mortgage loan for Mr. Washington that a reasonable mortgage broker should know was not in his best interest.

217.     Mr. Washington suffered damages as a result of this breach of fiduciary duty by losing significant equity in the Subject Property. He, therefore, has a statutory right to recover actual damages, attorney's fees, and court costs. *See* Va. Code § 6.2-1627.

   a.   **Defendant Owen Owed Mr. Washington a Fiduciary Duty as His Mortgage Broker**

218.     Virginia's Mortgage Lenders and Mortgage Brokers Regulations establishes a fiduciary duty for mortgage brokers to "use reasonable skill, care, and diligence in exercising the broker's duty, which duty is hereby created, to make reasonable efforts to secure a mortgage loan that is in the best interest of the applicant, considering the applicant's circumstances and loan characteristics." *See* Va. Code § 6.2-1616(B)(6).

219.     Virginia defines a "mortgage loan" as a "loan made to an individual, the proceeds of which are to be used primarily for personal, family, or household purposes, which loan is secured by a

mortgage or deed of trust upon any interest in one-to four-family residential property located in the Commonwealth." *See* Va. Code § 6.2-1600.

220.     The Subject Mortgage Loan was a "mortgage loan" as defined by Va. § 6.2-1600 because it was a loan made to Mr. Washington, the true borrower on the loan, for the primary purpose of refinancing his family home, and secured by a deed of trust upon any interest in a one-to four-family residential property.

*221.*     Any bad faith attempt by the Defendants to evade consumer protections through characterizing the borrower on the Subject Mortgage Loan as an entity shall be ignored consistent with Virginia's emphasis on substance over form in interpreting consumer loans. *See Van Dyke v. Commonwealth*, 178 Va. 418, 424, 17 S.E.2d 366, 369 (Va. 1941) ("To frustrate [consumer protection] evasions the courts have been compelled to look beyond the form of a transaction to its substance, and they have laid it down as an inflexible rule that mere form is immaterial, but that it is the substance which must be considered.").

222.     A mortgage broker refers to a person who directly or indirectly negotiates, places, or finds mortgage loans for others. Va. Code § 6.2-1600.

223.     From June 21, 2011 through February 12, 2020, Defendant Owen was a registered Federal Mortgage Loan Originator and in the ordinary course of business regularly negotiated, placed, and found mortgage loans for others, and is therefore a mortgage broker as defined by Va. Code § 6.2-1600.

224.     When Defendant Owen, in his capacity as a mortgage broker, first met Mr. Washington to discuss finding him a mortgage loan, he had a fiduciary duty to act in Mr. Washington's best interest in obtaining a mortgage loan under Va. Code § 6.2-1616(B)(6).

225.     In addition, when Defendant Owen actually found Mr. Washington the Subject Mortgage Loan, Defendant Owen served as his mortgage broker and therefore owed Mr. Washington a fiduciary duty under Va. Code § 6.2-1616(B)(6).

**b.   <u>Defendant Owen Breached His Fiduciary Duty to Mr. Washington</u>**

226.     Mr. Washington specifically told Defendant Owen that he was feeling "desperate" to save his home after other mortgage lenders rejected his request for refinancing.

227.     Because Defendant Owen  was on notice that Mr. Washington had been consistently rejected from refinancing for his mother's mortgage, Defendant Owen, as a federally licensed mortgage loan originator, knew that other mortgage originators believed that Mr. Washington would have trouble paying back a traditional mortgage loan. Accordingly, Defendant Owen knew or should have known that Mr. Washington would struggle  (1)  to pay back any mortgage loan and (2) to obtain a mortgage refinancing loan on any new mortgage loan.

228.     With this knowledge, Defendant Owen knew or should have known that a nine-month balloon note with $39,858 in settlement and closing fees was not in the best interest of Mr. Washington.

229.     At the closing, Defendant Owen told Mr. Washington that he received financial compensation, the loan origination fee, for his role in brokering the Subject Mortgage Loan.

230.     By finding Mr. Washington a loan that financially benefited Defendant Owen and was not in the best interest of Mr. Washington, Defendant Owen breached his fiduciary duty by placing his own financial interests ahead of the interests of Mr. Washington.

231.     Because Defendant Owen knew or should have known the Subject Mortgage Loan was not in Mr. Washington's best interests, Defendant Owen breached his fiduciary duty by failing "to make reasonable efforts to secure a mortgage loan that is in the best interests of the applicant." Va. Code § 6.2-1616(B)(6).

   c.   **Mr. Washington Incurred Damages as a Result of Defendant Owen's Breach of Fiduciary Duty**

232.     As a result of Defendant Owen's breach of his Mortgage Broker Fiduciary Duty claim, Mr. Washington incurred $39,858 in settlement and closing fees, and $16,380 in late fees on the Subject Mortgage Loan, all of which erodes from Mr. Washington's equity in the Subject Property.

233.     Additionally, as a result of Mr. Owen's breach, Mr. Washington's home is now up for foreclosure and Mr. Washington's equity in the home is potentially subject to even further losses.

36

234.        Accordingly, Mr. Washington requests that this Court enter judgment in his favor and order Defendant Owen pay Mr. Washington actual damages, attorney's fees, and court costs as authorized when a mortgage broker breaches his fiduciary duty by Va. Code § 6.2-1627 in an amount determined by this Court.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this court,

1.  assume jurisdiction of this case;

2.  pursuant to TILA and HOEPA,

    a.   order the rescission of Mr. Washington's Subject Mortgage Loan;

    b.   order Defendant Lender to return of any finance charges and fees paid to Defendant Lender;

    c.   enter an order exercising the Court's equitable jurisdiction to alter the timing of tender to allow Mr. Washington a reasonable time to obtain financing or sell Subject Property to tender the amount due by him in TILA rescission, if any amount will be due by him in TILA rescission;

    d.   order Defendant Lender to terminate any security interest in 43 Country Lane created as a result of the Subject Mortgage Loan;

    e.   declare any security interest in 43 Country Lane created as a result of the Subject Mortgage Loan described herein as null and void; and

    f.   order that Defendant Lender pay to Mr. Washington the costs of this action, together with reasonable attorney's fees as determined by this Court;

3.  pursuant to HOEPA, order Defendant Lender pay the following damages to Mr. Washington:

    a.   actual damages sustained as a result of Defendant Lender's violations of 15 U.S.C. §§ 1635 and 1639;

    b.   statutory damages as described in 15 U.S.C. § 1640(a); and

    c.   additional enhanced damages in an amount equal to the sum of all finance charges and fees paid by Mr. Washington;

4.  pursuant to the common law of fraud, award punitive damages in the amount of $45,000, and order the rescission of: (1) the Sham LLC's Articles of Incorporation; (2) the Deed of Transfer conveying the Subject Property from Mr. Washington to the Sham LLC, thereby voiding the security interest created by the Deed of Trust in the Subject Property; and (3) the Subject Mortgage Loan due to John Ralston's fraud by omission with respect to his concealed role as the Lender's attorney, and the true costs of this mortgage;

5.  pursuant to the tort of conversion, order compensatory damages totaling $15,000;

6.  pursuant to the VCPA, order damages pursuant to Va. Code § 59.1-204(A), in an amount determined by the court, as well as reasonable attorney's fees.

7.  pursuant to Defendant John Ralston's and Defendant Owen's breach of fiduciary duty, order actual damages, attorneys fees, and court costs pursuant to Va. Code § 6.2-1627;

8.  Plaintiff is not asking that he be awarded damages twice for the same harm, and to the extent there is overlap of damages, asks only to recover once;

9.  award any such relief as the court deems appropriate.

JURY DEMAND

Plaintiff requests a jury on all claims so triable.


                  Respectfully submitted,


                  Eric Washington

                  By Counsel



_____

38

Caroline F. Klosko, VSB No. 78699

LEGAL AID JUSTICE CENTER

1000 Preston Avenue, Suite A
Charlottesville, VA  22903
Tel:(434) 977-0553

Fax: (434) 977-0558

Email: carrie@justice4all.org